[No. 21813. Department Two. September 28, 1929.]

E. J. HARPER, *Respondent,* v. FIREMAN'S FUND
INSURANCE COMPANY, *Appellant.*[1]

*E. Eugene Davis,* for appellant.
*Thomas A. E. Lally,* for respondent.

FRENCH, J.—Respondent recovered, in an action
tried before the court and a jury, certain insurance
money claimed to be due by reason of a fire taking
place June 25, 1926. From the evidence adduced, the
jury were entitled to find the following facts: In Sep-
tember, 1925, respondent and one Carey owned a lum-
ber yard at Kane Siding in Stevens county, Washing-
ton; that this lumber yard was in active operation, new
lumber being placed therein from time to time, and
old lumber being constantly sold from this yard. The
Home Guaranty Company, a corporation, having for
its president Mr. Peddycord, and its secretary Mr.
Munger, were the licensed agents of appellant, and in
September, previous to the fire, issued a policy of in-

[1]Reported in 280 Pac. 743.

surance to Harper and Carey as owners, covering the lumber in this lumber yard. Mr. Peddycord was president of the bank in Colville, and Mr. Munger, up to about the time of the fire, had been an employee of the bank, but at that time or shortly before, he was devoting his entire time to the affairs of the Home Guaranty Company, handling insurance matters. Respondent had, from time to time, borrowed money from either the bank or Mr. Peddycord, and this insurance was taken not only for the protection of respondent, but for the protection of Mr. Peddycord or the bank which he represented.

The transactions had all been handled in about this way: Mr. Harper would notify Mr. Peddycord of the amount of lumber on hand in the lumber yard, and Mr. Peddycord would then advise Mr. Munger of the amount of insurance desired on the lumber in the yard, and the policy would be written and retained by the Home Guaranty Company and a bill for the insurance would be presented to the bank and charged to the account of respondent. All the insurance policies had been handled in this way. At the time of writing the policy in controversy in this case, Mr. Harper was arranging to, and shortly thereafter did, buy out the interest of Mr. Carey, all with the full knowledge of Mr. Peddycord and Mr. Munger. The policy issued in this case contained the following clause:

"Clear Space Warranty. Warranted by the assured that a continuous clear space of 300 feet shall hereafter be maintained between all and/or any property insured under the first item of this policy, and any dry kiln, woodworking or manufacturing establishment, slab pit or refuse burner, and that such clear space shall not be used for the handling or piling of lumber or other merchandise therein for any purpose, it being the intention of the parties that such clear space shall establish the yard limits.

"It is further understood and agreed by the insured that any violation of this warranty shall wholly suspend the insurance under the item or items above referred to in this warranty during the period such violation shall continue.

"Permission, however, is granted the insured under this policy to load or unload within and to transport lumber and or other merchandise across such clear space, and to maintain thereon tramways upon which lumber or other merchandise shall not be piled, except that when lumber is transported from mill to yard by overhead electric system, the piling of lumber for such transportation within the clear space for a period of not exceeding 72 hours shall not be considered a violation of this warranty; the insurance under the item or items referred to in the above warranty however, not to cover any property of any kind whatsoever within said clear space."

At the time of the issuing of the policy, both Mr. Munger and Mr. Peddycord knew that Mr. Harper was about to install a planing mill in the middle of the lumber yard. They also knew that, shortly thereafter, this planing mill was installed. Over a period of many years, the Home Guaranty Company had handled the insurance of Mr. Harper or the insurance of Harper and Carey exactly as this insurance was handled, namely, the entire matter was left to the insurance agents. They wrote the policy, retained it, and attended to the details to see that the risk was properly covered. On June 17, 1926, the following letter was written to Mr. Harper:

"Colville, Washington, June 17, 1926.
"Mr. E. J. Harper,
"Northport, Washington.

"We received the new fire insurance rates yesterday, on your plant, and were dumbfounded to note that they had raised the rates on your lumber to $7.20, the same rate as the planing mill.

"Mr. Munger happened to meet the rating bureau man last night, and asked him if they did not make a

mistake in printing and he said 'no,' that there was practically no clearing space between your lumber yard and the planing mill. In order to get the $2 rate on lumber, it is absolutely necessary that you at all times maintain a 300 foot clearance space. In fact, you agreed to do so in all the policies we have written, and in case of loss there might have been some question about it.

"Somebody must have gotten careless about maintaining this 300 foot space. Mr. Munger says that the thing for you to do is to get this clearing space established beyond question and then notify us in writing, and we will notify the rating bureau, and they will change it. G. W. Peddycord,

"President."

There is in the state of Washington a rating bureau which fixes the tariff rates at which the so-called old line standard insurance companies write policies of insurance, excepting that in some instances there are deviations therefrom, the rule being, as we understand it, that an agency such as the Home Guaranty Company in this case, is bound by the rates made by the rating bureau unless otherwise notified by the company. After the sending of the above letter and before the first of the month when charges were to be made for insurance, the fire occurred.

The jury were fully warranted in believing from the testimony, however, that the rate of $7.20 would have been charged thereafter.

The assignments of error all go to the one general proposition, namely, that, there having been a violation of the clear space warranty contained in the policy as actually written, there can be no liability on the part of the appellant. No assignment of error is predicated upon the admission or rejection of testimony, or the instructions given or refused.

The Home Guaranty Company had full power and authority to write a policy containing the "clear

space'' provision of three hundred feet, or any lesser number of feet, or containing no provisions whatsoever as to clear space. The rate charged, however, would have been different in each case. In the instant case, respondent had no knowledge of the ''clear space'' provision. He had requested insurance to cover his lumber. All the conditions and circumstances surrounding the lumber were known to the officers of this agency. They attempted and intended to cover the particular lumber destroyed by fire. They had charged to respondent's bank account and collected from respondent the premium which the agency deemed proper to collect. The agency did not exceed its power. It simply make a mistake and wrote a policy, and charged a rate to cover a risk, when it should have written a different form of policy and charged a different rate. There was no misrepresentation by respondent. All the facts were disclosed, the conditions were known, and the agency intended to issue a policy covering this risk. The mistake of the agency was the mistake of the company. The agency knew of the contemplated change of ownership; knew when it took place; had full knowledge of the installation of the planer; had the policy in its possession; had full power and authority to make any changes in the form of the policy, and full power and authority to charge to respondent's bank account the proper rate. The knowledge of the insurance agency was the knowledge of the company, and any mistake or inadvertence in the form of the policy should be charged against the company. We think the language of this court in *Gaskill v. Northern Assurance Co.*, 73 Wash. 668, 132 Pac. 643, is peculiarly applicable:

"Since the mistake occurred through no fraud, wrong, or misrepresentation on the part of the Amicks, the contract should be reformed to speak the mutual intention of the parties and so enforced. The princi-

pal, rather than the person with whom he deals through an agent, should be held accountable for mistake of the agent committed in the course of the very transaction entrusted to his performance. There is no sound principle, either of law or equity, upon which the insured may be punished for the mistakes of the insurer's agent, so as to relieve the insurer from the liability which he meant to undertake and for which he was paid."

The evidence in this case amply warranted the jury in finding that both Mr. Peddycord and Mr. Munger knew every essential fact concerning this property. Their testimony warrants the conclusion that both intended to, and believed it covered the risk; that it was the intention of respondent to obtain and pay the proper rate for a policy which would fully protect him and it was the intention of the agency to issue such a policy; that the agency had full power to issue such a policy and the means at hand to collect therefor, and that after the receipt of the letter of June 17, the jury were warranted in believing that the respondent would be charged an additional rate. A different situation would arise if this were a prohibited risk. We think our observations in *Port Blakely Mill Co. v. Springfield Fire & Marine Insurance Co.*, 59 Wash. 501, 110 Pac. 36, 140 Am. St. 863, 28 L. R. A. (N. S.) 596; *Norris v. China Traders' Insurance Co.*, 52 Wash. 554, 100 Pac. 1025; and *Gaskill v. Northern Assurance Co.*, *supra*, are all applicable to this case, and that the evidence fully justified the verdict of the jury.

Affirmed.

MAIN, PARKER, MILLARD, and BEALS, JJ., concur.